**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| KAYLA D. KAIN,<br><br>            Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>            Defendant. | CASE NO. 1:24-CV-00914-AMK<br><br><br>MAGISTRATE JUDGE AMANDA M. KNAPP<br><br>**<u>MEMORANDUM OPINION AND ORDER</u>** |

Plaintiff ("Plaintiff" or "Ms. Kain") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  (ECF Doc. 1.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter is before the undersigned by consent of the parties under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  (ECF Doc. 7.)

For the reasons set forth below, the final decision of the Commissioner is **VACATED**, and the case is **REMANDED**, pursuant to 42 U.S.C. § 405(g) sentence four.  On remand, the ALJ should apply the standard of review articulated by the Sixth Circuit in *Earley v. Comm'r of Soc. Sec.*, 893 F.3d 929 (6th Cir. 2018) to any consideration of a prior ALJ's residual functional capacity findings, and should ensure that he considers the entire alleged disability period.

**I.     Procedural History**

Ms. Kain filed a prior DIB and SSI application on March 29, 2019, alleging disability beginning July 26, 2018.  (Tr. 64.)  On March 9, 2020, an Administrative Law Judge ("ALJ")

found Ms. Kain was not disabled from her alleged onset date of July 26, 2018, through the date of the decision.  (Tr. 64-76 ("2020 ALJ decision").)

Ms. Kain filed the DIB application that is the subject of this appeal on January 19, 2021, alleging disability beginning on July 26, 2018.  (Tr. 94.)  The application was denied at the initial level and on reconsideration.  (Tr. 94, 101.)  Ms. Kain testified at a hearing before an ALJ on September 22, 2021.  (Tr. 31.)  On November 2, 2021, the ALJ found her not disabled from March 5, 2020, through the date of the decision.  (Tr. 12-30 ("2021 ALJ decision").)  Ms. Kain requested review of the decision by the Appeals Council, which denied her request.  (Tr. 1-3.)  Ms. Kain then appealed the 2021 ALJ decision to federal court, which ordered a remand to the Commissioner on May 30, 2023, based upon a joint stipulation of the parties.  (Tr. 2368-69.)

In response to the federal court remand, the Appeals Council vacated the 2021 ALJ decision on July 7, 2023, and remanded the case for resolution of the following issue:

> The hearing decision does not contain an adequate evaluation of the medical source opinions. An Administrative Law Judge will articulate the persuasiveness of all the medical opinions in the case record, including an explanation of how the Administrative Law Judge considered the factors of supportability and consistency (20 CFR 416.920c). The hearing decision does not adequately address the supportability of the medical source opinions of Drs. Jaegar and Isakov (Exhibits B17F; B19F, page 13). In evaluating the persuasiveness of these opinions, the Administrative Law Judge found that the opinions were not consistent with the overall evidence but did not provide specific evidence in the record to support this finding (Hearing Decision, page 8). The factor of supportability was not considered in the evaluation of these opinions. Further consideration should be given to this opinion evidence and the prior administrative findings.

(Tr. 2390.)  The Appeals Counsel also noted that a subsequent claim for DIB benefits was filed on March 10, 2023, and ordered the ALJ to consolidate the two claim files, associate the evidence, and issue a new decision on the consolidated claims.  (Tr. 2391.)

On December 14, 2023, the ALJ held a new hearing, at which Ms. Kain testified.  (Tr. 2314-37.)  At the hearing, she amended her alleged onset date to March 10, 2020.  (Tr. 2320.)

On February 28, 2024, the ALJ found Ms. Kain had not been under a disability from March 10, 2023, through the date of the decision.  (Tr. 2290-2313 ("2024 ALJ decision").)[1]  Plaintiff filed a Complaint seeking judicial review in federal court on May 23, 2024.  (ECF Doc. 1.)  The case is fully briefed and ripe for review.  (ECF Docs. 9, 11, 12.)

## II.    Evidence

### A.    Personal, Educational, and Vocational Evidence

Ms. Kain was born in 1993 and was 26 years old on the amended alleged disability onset date, making her a younger individual under Social Security regulations on the amended alleged onset date.  (Tr. 2370, 2378.)  She had at least a high school education.  (Tr. 2371, 2379.)  She has not worked since March 10, 2020, the amended alleged onset date.  (Tr. 2320-21.)

### B.    Medical Evidence

#### 1.    Treatment History Before the Amended Alleged Onset Date

On July 26, 2018, Ms. Kain went to a Cleveland Clinic emergency room with a racing heart.  (Tr. 493, 3631.)  She was admitted to the ICU and diagnosed with sinus tachycardia that was believed to be triggered by the steroids and doxepin she had taken to treat a rash.  (Tr. 493.)  When she remained tachycardic after stopping these medications, she was prescribed a low dose of metoprolol with improvement in symptoms.  (*Id.*)  This hospitalization triggered a variety of tests and visits with specialists to diagnose and properly treat Ms. Kain for headaches, tachycardia, and related symptoms.  (*See, e.g.*, Tr. 494, 663-82 (summary of labs and tests conducted between 2018 and 2020).)

---

[1] The ALJ inaccurately stated that the amended alleged onset date was March 10, 2023 (Tr. 2293) and referred to a disability period beginning March 10, 2023 (Tr. 2294, 2296), but at other points appeared to reference the initial alleged onset date in 2018 (Tr. 2303, 2304).  It is undisputed that the amended alleged onset date was March 10, 2020.  (ECF Doc. 9, p. 22; ECF Doc. 11, p. 13; Tr. 2320.)  As this discrepancy is the basis for Plaintiff's fourth assignment of error, any substantive effect of the error is addressed below.  *See* Section VI.B., *infra*.

Ms. Kain underwent a tilt test on August 2, 2018, to test for postural orthostatic tachycardia ("POTS").  (Tr. 405-06.)[2]  She tolerated 45 minutes of tilt with lightheadedness and other symptoms but without vasovagal response, orthostatic hypotension, loss of consciousness, or syncope.  (Tr. 406.)  Her baseline sinus tachycardia persisted throughout the test with moderate increase but did not reach orthostatic tachycardia criteria.  (*Id.*)  Her blood pressure was 120/85 at the end of the tilt and her heart rate increased from 104 beats per minute ("bpm") to 116 bpm.  (Tr. 405.)  An electrocardiogram ("ECG" or "EKG") showed normal sinus rhythm sinus tachycardia throughout the test.  (*Id.*)  Different doctors later reviewing this tilt test noted that it did not meet the criteria for a POTS diagnosis.  (*See, e.g.*, Tr. 423, 2257.)

On August 8, 2018, Ms. Kain followed up on her July 2018 hospital visit with her primary care provider, Terence Isakov, M.D., at New Family Physicians Associates in Lynhurst, Ohio.  (Tr. 3616-18; *see* Tr. 3602-23 (records showing Dr. Isakov's care of Ms. Kain since April 2018).)  On examination, her blood pressure was 105/78, and her pulse was 98.  (Tr. 3617.)  Her heart rate and rhythm were normal.  (*Id.*)  Dr. Isakov assessed Ms. Kain with cardiac arrythmia, unspecified.  (*Id.*)  At a second follow-up on August 29, 2018, Ms. Kain reported feeling well, and she and Dr. Isakov discussed her upcoming appointment with a cardiologist.  (Tr. 3615.)  Dr. Isakov assessed Ms. Kain with hypotension, stable.  (*Id.*)

On September 12, 2018, Ms. Kain established care with Frederick Jaeger, DO, at Cleveland Clinic Heart and Vascular Institute.  (Tr. 3881-86.)  She continued to see him during the rest of 2018 (*see* Tr. 3827-28, 3862-63).  Parallel to these visits, she attended cardiac rehabilitation with no significant complaints.  (*See, e.g.*, 3827, 3871-74.)

---

[2] There is no copy of the original documentation of this tilt test in the record, but multiple treatment notes reference or summarize it, and the ALJ referenced it multiple times in both his 2021 and 2024 decisions by citing these treatment notes.  (*See* Tr. 19-20, 2297, 2300.)  The cited pages appear to contain a complete summary of the tilt test.

On December 14, 2018, Dr. Jaeger provided Ms. Kain with a CardioNet heart monitor, which she used until January 7, 2019.  (Tr. 3831.)  The device recorded no A. fib episodes and no significant atrial or ventricular ectopy, pauses, heart block, arrythmias, or bradycardia.  (*Id.*)  There were frequent automatic recordings of mild to moderate sinus tachycardia.  (*Id.*)

On October 28, 2019, Ms. Kain attended an appointment with Dr. Jaeger.  (Tr. 429-33.)  She reported daily headaches that worsened throughout the day and feeling her heart racing with minimal changes in position, laughing, talking, walking, and with any movement.  (*Id.*)  She had stopped exercising due to leg pain and became dizzy when bending over to pick something up or tie her shoes.  (*Id.*)  She was following a high sodium diet and drinking Gatorade daily.  (*Id.*)  She denied chest pain, shortness of breath, orthopnea, cough, edema, palpitations, lightheadedness, near syncope, or syncope.  (*Id.*)  She was taking metoprolol 10 mg every six hours and wearing compression stockings.  (Tr. 431.)  On physical examination, her blood pressure was 120/85 standing, 113/75 sitting, and 114/71 supine.  (*Id.*)  Her heart rate was regular with no murmurs or rubs, and an EKG revealed normal sinus rhythm.  (Tr. 432.)  Dr. Jaeger continued Ms. Kain on her medications, reviewed lifestyle changes to address her symptoms, and ordered a follow-up in three to four months.  (*Id.*)

On January 22, 2020, Ms. Kain attended a follow up appointment with Dr. Jaeger.  (Tr. 420-422.)  She continued to report ongoing daily headaches that worsened throughout the day and feeling her heart race with minimal changes in position and with any movement.  (Tr. 420-23.)  She became dizzy and experienced visual disturbances when bending over.  (Tr. 421.)  She continued a high sodium diet, drank one to two liters of Gatorade a day, and wore waist high compression stockings.  (*Id.*)  She still took metoprolol 10 mg/ml liquid by mouth every six hours.  (Tr. 422.)  An ECG done on this date showed normal sinus rhythm.  (*Id.*)  A physical

examination was likewise normal, with regular heart rate/rhythm without murmurs or rubs.  (*Id.*)
Dr. Jaeger discussed continuing Ms. Kain's treatment modalities, elevating her head at bedtime,
and regular exercise.  (Tr. 423.)  He scheduled a follow-up in six months.  (*Id.*)

On January 23, 2020, at Dr. Jaeger's referral, Ms. Kain saw neurologist Robert W.
Shields, Jr., M.D., at the Cleveland Clinic.  (Tr. 417-20, 2255-58.)  She reported onset of her
symptoms in July 2018, including itchy rashes and dizziness, especially when changing position.
(Tr. 418, 2255.)  These symptoms occurred 40-50% of the time, and Ms. Kain could only walk
for 10-15 minutes at a time.  (*Id.*)  She also reported daily headaches since September 2018 that
she described as pressure on the back-left side of her head without sensitivity to light and noise.
(*Id.*)  Medication was not helping.  (*Id.*)  Dr. Shields conducted a neurological examination that
was "entirely normal."  (Tr. 2257.)  He further noted that although Ms. Kain had orthostatic
symptoms, orthostatic vital signs did not disclose significant orthostatic tachycardia and tilt
testing results did not meet the criteria for POTS.  (*Id.*)  He ordered additional labs to test for
possible underlying autonomic/small fiber neuropathy and advised continuing medications and
cardiac rehabilitation.  (*Id.*)  He also referred Ms. Kain to a headache clinic.  (Tr. 2258.)

On January 24, 2020, Ms. Kain saw Stephan Samples, M.D., at Hillcrest for an
evaluation of her chronic headaches.  (Tr. 416-17, 3755-56.)  She reported no longer taking over-
the-counter medications to help her headaches.  (Tr. 417.)  On examination, Ms. Kain was cogent
but a little slow to respond with no other positive findings.  (*Id.*)  Dr. Samples ordered an
MRI/MRV with a follow-up in one month.  (*Id.*)  Ms. Kain underwent an MRI/MRV of the brain
on March 5, 2020, which was negative.  (Tr. 415; *see also,* 755-61, 4267.)

## 2. Treatment History After Amended Alleged Onset Date

On June 4, 2020, Ms. Kain saw Michael L. Amalfitano, DO., at Medina Cleveland Clinic Heart and Vascular Institute to establish cardiac care. (Tr. 408-12.) She reported tachycardia provoked by "postural and activity," with severe dizziness, but denied syncope or near syncope. (Tr. 408.) She also reported daily headaches that worsened throughout the day, fatigue, and struggles with the activities of daily living. (Tr. 408-09.) She was following a cardiac rehab plan using a treadmill and recumbent bike and noticed that her heart rate stayed at 115-117 bpm for the next day or so after using the treadmill. (Tr. 408.) On examination, Ms. Kain had a pulse of 95, blood pressure of 102/58, and no positive cardiac findings. (Tr. 410.) Dr. Amalfitano assessed her with inappropriate sinus node tachycardia. (Tr. 411.) He noted that Ms. Kain had many of the common dysautonomia symptoms seen with POTS but found she did not fit the criteria for a diagnosis. (*Id.*) He prescribed a trial of Ivabradine and advised Ms. Kain to increase fluid and sodium intake and avoid situations that caused her heart to race, such as getting up too quickly or standing for long periods. (Tr. 411-12.)

Ms. Kain had a telephone follow-up with Rebecca Palmer, APRN, CNP, from Dr. Amalfitano's office on June 18, 2020. (Tr. 399-400.) Ivabradine had been discontinued due to concerns about possible side effects, but Ms. Kain reported feeling "pretty good" after an increase in her metoprolol dose. (Tr. 399.) Her home blood pressure had been stable, and she denied chest pain, shortness of breath, palpitations, lightheadedness, and dizziness. (*Id.*) Her review of systems was negative for headaches, rashes, or itching. (*Id.*) APRN Palmer noted that Ms. Kain appeared stable from a cardiac standpoint and was tolerating the increase in metoprolol without side effects or hypotension. (Tr. 400.)

7

Ms. Kain presented to Dr. Brenner at Cleveland Clinic Family Physicians on June 30, 2020, to follow-up on her headaches and alopecia.  (Tr. 1487-93.)  Her review of systems was negative, her blood pressure was 130/84, and her pulse was 90.  (*Id.*)  She was diagnosed with migraine headaches and prescribed 25 mg Topamax to be taken daily.  (Tr. 1492-93.)

On August 5, 2020, Ms. Kain returned to see Dr. Amalfitano.  (Tr. 390-92.)  She reported still doing well on increased metoprolol.  (Tr. 390.)  Her home blood pressure had been stable, and she denied chest pain, shortness of breath, palpitations, lightheadedness, and dizziness.  (*Id.*)  Her physical exam was normal, including a regular heart rate with no murmurs, gallops, or rubs.  (Tr. 390-91.)  Dr. Amalfitano continued metoprolol and advised her to increase fluid and sodium intake and avoid situations that caused her heart to race.  (Tr. 391.)

On August 14, 2020, Ms. Kain presented to the Cleveland Clinic Emergency Department in Twinsburg.  (Tr. 383-86.)  She complained of daily headaches since September 2019 that were not relieved by over-the-counter medication or Topamax.  (Tr. 383.)  She said her current pain was 9 out of 10 in severity.  (*Id.*)  She was not taking recently prescribed Zanaflex for fear it would interact negatively with metoprolol.  (*Id.*)  She also reported an intermittent itchy rash on her extremities that was associated with heat.  (*Id.*)  Ms. Kain's physical examination showed a blood pressure of 128/78, a pulse of 97, and normal heart rate and rhythm.  (Tr. 385.)  The nurse on duty spoke with Ms. Kain about treating her headaches with "IV headache cocktail meds," but Ms. Kain refused, stating medications either did not work or interacted with her metoprolol.  (Tr. 386.)  She also refused oral Reglan and left the emergency department without discharge papers or further information.  (*Id.*)

At a September 10, 2020 appointment with Dr. Shields, Ms. Kain continued to report daily headaches and symptoms of orthostatic lightheadedness, saying she almost always needed

to sit.  (Tr. 369.)  Her blood pressure was 123/72 standing and 117/59 supine.  (Tr. 370.)  Dr. Shields again noted clinical features of orthostatic lightheadedness with a sense of heart racing and pounding, but his neurological examination was normal and orthostatic vital signs did not disclose significant orthostatic tachycardia or meet the criteria for POTS.  (Tr. 370-71.)  He asked Ms. Kain to take her orthostatic vital signs at home and report the findings to him.  (Tr. 371.)  He noted recent prescriptions for Topamax and Toradol to treat headaches (Tr. 369) and continued her non-pharmacological treatments and cardiac rehab program (Tr. 371).

On January 14, 2021, Ms. Kain had a telehealth follow-up appointment with Dr. Shields to discuss the results of a home orthostatic VS test.  (Tr. 1310.)  Dr. Shields had ordered the test to evaluate whether Ms. Kain had POTS or inappropriate tachycardia syndrome.  (*Id.*)  From September to December 2020, Ms. Kain took vital signs at home and reported the results to Dr. Shields.  (*Id.*)  Dr. Shields opined that the pattern of orthostatic tachycardia revealed by the measurement "definitely" met the criteria for POTS.  (*Id.*)  He also noted that "tilt testing did not disclose significant orthostatic tachycardia meeting criteria for POTS" but that "the heart rate did increase to 120 bpm at minute 30 and 40 during tilt which is consistent with POTS."  (*Id.*)  Due to Ms. Kain's chronic tachycardia symptoms, Dr. Shields opined that she needed to remain off work for a minimum of six months.  (*Id.*)   He wrote a disability letter indicating as much.  (Tr. 1311.)  He ordered Ms. Kain to continue a cardiac rehabilitation exercise program and continue her non-pharmacologic treatments until a routine follow-up in May 2021.  (Tr. 1310.)

On February 26, 2021, Ms. Kain saw Dr. Samples at Hillcrest.  (Tr. 304.)  He noted that she had a negative POTS workup in the past, but that Dr. Shields had recently diagnosed POTS based on other data.  (*Id.*)  Dr. Samples prescribed Effexor as the "standard for POTS migraine" since Topamax had been ineffective to treat Ms. Kain's headaches.  (*Id.*)

Ms. Kain attended a follow-up with Dr. Shields on May 27, 2021.  (Tr. 1556.)  She continued to experience orthostatic lightheadedness triggered by bending over and then standing upright, which occurred 90-95% of the time.  (*Id.*)  Her symptoms sometimes improved if she moved from sitting to standing slowly.  (*Id.*)  In her cardiac rehab program, Ms. Kain had graduated from cycling to walking.  (*Id.*)  Dr. Shields scheduled a follow-up in six months.  (*Id.*)

On July 16, 2021, Ms. Kain saw Dr. Isakov to follow-up on paperwork and Dr. Shield's POTS diagnosis.  (Tr. 1424-28.)  Her review of systems was negative, her blood pressure was 100/62, and her heart rate was 77.  (Tr. 1428.)  Dr. Isakov noted Dr. Shield's POTS diagnosis and recommended that Ms. Kain not work for six months.  (*Id.*)

In late July 2021, Ms. Kain followed-up with Dr. Shields via online messaging on MyChart about her long-term disability application denial based on the reviewing doctor's opinion that she did not have POTS.  (Tr. 1529.)  Dr. Shields informed Ms. Kain that her August 2018 tilt test results were "technically insufficient for a definite diagnosis" of POTS.  (*Id.*)  He indicated that her home-recorded vital signs were diagnostic but probably not accepted as "objectively reliable information" because not obtained in a medical setting.  (*Id.*)  He recommended she retake the tilt test as her condition had likely changed since 2018.  (*Id.*)

On October 22, 2021, Ms. Kain presented to Dr. Isakov with chest pain.  (Tr. 3656-57.)  On examination, her blood pressure was 110/80, and her heart rate and rhythm were normal.  (Tr. 3657.)  An EKG done in the office was normal.  (*Id.*)  Dr. Isakov diagnosed Ms. Kain with chest pain, unspecified type, and told her to follow-up if symptoms persisted or worsened.  (*Id.*)

On November 22, 2021, Ms. Kain attended a neurological consultation with Robert W. Kosmides, M.D., to address severe headaches.  (Tr. 3653-56.)  She reported that the pain was in the back of the head and worsened throughout the day, requiring her to spend 95% of the day

10

supine.  (*Id.*)  Dr. Kosmides reviewed Ms. Kain's other doctors' notes and noted her pain was likely not a migraine.  (*Id.*)  Her neurological examination was normal, her blood pressure was 111/73, and her pulse was 79.  (Tr. 3656.)  Dr. Kosmides assessed Ms. Kain with chronic headache and planned to try muscle relaxants.  (Tr. 3653.)

Ms. Kain underwent a repeat tilt test on February 3, 2022.  (Tr. 3640-41.)  Her systolic blood pressure went from 116/82 at the start of the test to 124/96 at the end.  (Tr. 3640.)  Her heart rate remained stable at 102 bpm to 95 bpm and returned to 97 bpm upon return to supine position.  (*Id.*)  Ms. Kain experienced dizziness, headache, and vision changes during the test. (Tr. 3641.)  The test was negative for syncope and resting supine sinus tachycardia remained stable during upright tilt.  (*Id.*)  This pattern was not diagnostic for POTS but was consistent with inappropriate sinus tachycardia.  (*Id.*)

On April 27, 2022, Ms. Kain attended a virtual visit with Dr. Amalfitano.  (Tr. 3645-48.) She reported a heart rate in the 130s-140s throughout the day that did not necessarily worsen with postural changes, but did accelerate early with exercise.  (Tr. 3645.)  She was continuing to drink Gatorade, eat extra salt, and wear compression socks, but she had to stop cardiac rehab due to severe headaches.  (*Id.*)  She also continued to take metoprolol, now at 20mg every six hours. (*Id.*)  Other tachycardia medications that had been ordered in the past (pyridostigmine and ivabradine) were not covered by her insurance.  (*Id.*)  Dr. Amalfitano noted the recent tilt test showed a resting sinus tachycardia but no evidence meeting criteria for POTS.  (*Id.*)  Ms. Kain's review of systems was positive for nausea and loose stool, heat intolerance, migraines, and rashes/itching.  (Tr. 3647.)  Dr. Amalfitano diagnosed inappropriate sinus node tachycardia and dysautonomia, noting daily lightheadedness, dizziness, near syncope, and palpitations.  (*Id.*)  He continued her medications and ordered a six-month follow-up.  (Tr. 3648.)

On January 30, 2023, Ms. Kain saw APRN Palmer for a follow-up.  (Tr. 3637-41.)  Her autonomic dysfunction symptoms were well-controlled overall.  (Tr. 3637.)  She denied chest discomfort, frequent or prolonged palpitations, near-syncope, syncope, and shortness of breath.  (*Id.*)  She only experienced lightheadedness on days she did not intake enough salt.  (*Id.*)  She continued to wear waist-high compression stockings (*Id.*) and take metoprolol every six hours (Tr. 3639).  Her review of systems was negative, including for rashes/itching.  (Tr. 3639-40.)  On physical examination, her blood pressure was 108/62, her pulse was 78, and she had a regular heart rhythm with no murmur.  (Tr. 3640.)  An EKG conducted the previous day showed a normal sinus rhythm, sinus arrhythmia, moderate voltage criteria for left-ventricular hypertrophy ("LVH"), and 78 bpm.  (*Id.*)  It was noted that the moderate voltage criteria for LVH could be a normal variant and an updated ECG was ordered.  (Tr. 3641.)  No changes were made to Ms. Kain's medications, and she was advised to follow-up with Dr. Amalfitano in six months.  (*Id.*)

### 3. Relevant Opinion Evidence

#### i. Treating Sources

##### a. Dr. Jaeger

Ms. Kain's treating cardiologist, Dr. Jaeger, completed a medical source statement.  (Tr. 2242-44.)  The report is not dated.  (*Id.*)  Dr. Jaeger began treating Ms. Kain in September 2019.  (Tr. 2242.)  In support of his opinions, he noted her diagnoses of inappropriate sinus tachycardia, partial dysautonomia, and "likely POTS," with an "excellent" prognosis.  (*Id.*)  He also noted her symptoms of headaches, weakness, fatigue, exercise intolerance, dizziness, near syncope, and heart racing.  (*Id.*)  Finally, he noted positive clinical findings of frequent postural intolerance with postural tachycardia, and vasomotor instability with moderate venous pooling.  (*Id.*)  One listed clinical finding is almost illegible but appears to say: "normal exams."  (*Id.*)

12

Dr. Jaeger opined that Ms. Kain would likely be absent from work more than four days per month due to her impairments.  (*Id.*)  Regarding her functional capabilities, he opined that: she could sit for 15 minutes before needing to get up and stand for 10 minutes, then would need to sit down or walk around; she could sit and stand/walk less than two hours in an eight-hour workday; she would need a job that permitted shifting positions at will; she would need to take frequent unscheduled breaks during the work day for extended periods; she did not have significant limitations with reaching, handling, or fingering; and she would be off-task about 25% of the workday.  (Tr. 2243-44.)  He did not assess her abilities to lift/carry, twist, stoop, crouch, or climb ladders and stairs.  (Tr. 2243.)

### b.   Dr. Isakov

On April 1, 2020, Ms. Kain's primary care provider, Dr. Isakov, wrote an opinion regarding her functional capacity.[3]  (Tr. 2288.)  He opined that she was subject to the following restrictions: occasionally standing and walking; occasionally lifting and carrying up to 25 pounds; never pushing or pulling; occasionally climbing stairs; never balancing, stooping, kneeling, crouching, or crawling; never reaching overhead or below waist level; and occasionally using lower extremities bilaterally for foot controls.  (Tr. 2288.)

### ii.   Non-Treating Physicians

### a.   Long-Term Disability Independent Examining Physician

On May 28, 2021, Board Certified physician Robert Goldstein, M.D., examined Ms. Kain for her work-related, long-term disability claim.  (Tr. 2276.)  He reviewed her medical records and wrote a report as to her disability status on June 23, 2021.  (Tr. 2276-88.)

---

[3] This opinion appears to have been generated for Ms. Kain's long-term disability claim through her prior employer, and there is no original copy of the opinion in the record.  (Tr. 2288.)  Inasmuch as the ALJ cited to and reviewed Dr. Isakov's opinion, he reviewed the opinion as it is summarized in Dr. Goldstein's long-term disability medical report.  (Tr. 2301 (citing Tr. 2288).)

Dr. Goldstein's physical exam showed the following blood pressure readings and heart rates: 122/86 and 109 bpm while supine; 122/82 and 111 bpm while sitting; and 120/80 and 111 bpm while standing.  (Tr. 2287.)  Dr. Goldstein stated that these results were inconsistent with orthostatic hypotension and noted that the only other pertinent finding on physical examination was obesity.  (*Id.*)  An ECG showed sinus tachycardia with a heart rate of 103 bpm, a PR interval of 150 seconds without evidence of ventricular pre-excitation, a QRS duration of 78ms, and P-wave morphology consistent with sinus node exit site.  (*Id.*)

Based on his exam and review of the medical records, Dr. Goldstein found "no compelling reason to restrict the patient's functional activity whatsoever."  (*Id.*)  He stated that Ms. Kain did not meet the criteria for POTS based on her 2018 tilt test.  (*Id.*)  He also stated that her inappropriate sinus tachycardia had "not been fully explored," and she had not received certain pharmacological therapies (such as midodrine and ivabradine) that could effectively treat this condition.  (*Id.*)  He qualified his opinions by noting that the most relevant diagnostic tests (the tilt test and a heart monitor) were outdated.  (*Id.*)

Regarding Ms. Kain's functional limitations and maximal physical capacities, Dr. Goldstein opined that she had no restrictions.  (*Id.*)  He also reviewed Dr. Isakov's opinion and found it "by and large reasonable" except that Ms. Kain was in fact capable of: occasionally lifting/carrying up to 40 pounds; occasionally pushing/pulling up to 25 pounds; rarely reaching overhead and occasionally reaching below the waist; and occasionally balancing.  (Tr. 2288.)

### b.  State Agency Medical Consultants

On March 14, 2021, state agency medical consultant Diane Manos, M.D., conducted a physical residual functional capacity ("RFC") evaluation.  (Tr. 91.)  She adopted the RFC from the 2020 ALJ decision, stating that "current evidence does not reflect changes or worsening in

14

the ALJ conditions" and citing AR 98-4 and the "Drummond Ruling." (*Id.*)  The adopted RFC

limited Ms. Kain to sedentary work with the following additional limitations:

> occasionally reach overhead with the right and left; frequently reach in all other
> directions with the right and the left; occasionally climb ramps and stairs; never
> climb ladders, ropes or scaffolds; occasionally balance, stoop, kneel, crouch, and
> crawl; never be exposed to unprotected heights, moving mechanical parts, or
> operate a motor vehicle; frequently be exposed to humidity and wetness, dust,
> odors, fumes and pulmonary irritants, extreme cold, extreme heat and vibration;
> able to work in (up to and including) a loud noise environment.

(*Id.*)  On April 3, 2021, on reconsideration, state agency medical consultant Leanne Bertani,

M.D., affirmed Dr. Manos' adoption of the prior ALJ's RFC.  (Tr. 98.)

On June 28, 2023, state agency medical consultant Sheryl S. Smith conducted a new

physical RFC assessment.  (Tr. 2374-76, 2382-84.)  Dr. Smith noted that she was not adopting

the RFC from the 2021 ALJ decision because it had been vacated by the Appeals Council.  (Tr.

2375, 2383.)  She opined that Ms. Kain had the ability to: occasionally lift/carry 20 pounds and

frequently lift/carry 10 pounds; push or pull with no limitations; stand and/or walk for four hours

and sit for six hours in an eight-hour workday; occasionally climb ramps or stairs and never

climb ladders ropes or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl;

frequently reach in front and/or laterally and occasionally reach overhead; handle, finger, and

feel without limitation; avoid concentrated exposure to extreme cold or heat, wetness, humidity,

noise, vibration, and fumes, odors, dusts, etc.; and avoid all exposure to hazards such as

operating heavy machinery and unprotected heights.  (Tr. 2374-75, 2381-82.)

On reconsideration, on October 11, 2023, Indira Jasti, M.D., adopted the RFC from the

prior ALJ's 2020 decision "in compliance with the Drummond/Dennard ARs."  (Tr. 2398, 2404.)

She did not adopt the findings from the initial level of review after concluding that Dr. Smith had

incorrectly considered the 2021 ALJ decision, which was not final.  (*Id.*)

C.      **Hearing Testimony**[4]

     1.      **Plaintiff's 2021 Hearing Testimony**

At a telephonic hearing on September 22, 2021, Ms. Kain responded to questions from the ALJ and her attorney.  (Tr. 31-60.)  She was living with her parents.  (Tr. 39.)  She had no independent source of income.  (Tr. 40.)  She had a driver's license, but drove "very, very little." (*Id.*)  She had graduated from high school but had not worked since January 2020.  (*Id.*)

Since her January 2020 hearing before the prior ALJ, Ms. Kain testified that Dr. Shields had confirmed she had POTS rather than inappropriate tachycardia.  (Tr. 41.)  This did not change how he treated her condition.  (Tr. 46.)  Dr. Shields reportedly confirmed Ms. Kain's POTS diagnosis by having her take and record her vital signs at home after changing postural positions and send him the results.  (Tr. 41.)  She also sent Dr. Shields records from a heart rate monitor that she always wore.  (*Id.*)  Ms. Kain had undergone one tilt test but was scheduled for another to further confirm her POTS diagnosis.  (Tr. 42-43.)

Since January 2020, Ms. Kain reported that her symptoms had worsened in that she had daily headaches that lasted all day, woke up with dizziness, was always tired, had constant diarrhea, and often felt light-headed and nauseous.  (Tr. 41.)  She had developed rashes associated with heat that itched constantly and caused her legs to feel like they were on fire.  (*Id.*) She also experienced heart palpitations and felt her heart beating excessively.  (Tr. 42.)

On a typical day, Ms. Kain would wake up with her heart racing and lay in bed for a while, feeling dizzy and light-headed.  (Tr. 46.)  She would eat breakfast, take her medicine, then lay down to rest.  (*Id.*)  She would try to exercise, but her headaches become worse as her heart rate rose, so she was always tired and laying down to sleep.  (*Id.*)  She did not do any household

---

[4] In addition to providing hearing testimony, Plaintiff filled out two Adult Function Reports, dated May 1, 2021 (Tr. 244-62) and April 27, 2023 (Tr. 2647-65).  The two reports are identical and substantially similar to her testimony.

chores or go grocery shopping.  (Tr. 46-47.)  Her parents did those things because blood pooled in her legs when she stood up, forcing her heart rate to rise.  (Tr. 47.)

Ms. Kain testified that she could sit or stand about half an hour before needing to lay down when she took her medication.  (Tr. 47-48.)  Without medication, she could only sit or stand for 10 to 15 minutes.  (Tr. 48.)  When sitting, she always elevated her legs to about hip height; she did not sit in chairs where her legs were dangling to the floor.  (*Id.*)

Ms. Kain described her daily headaches as "severe" with pounding in the back-left side of her head.  (Tr. 49.)  They caused nausea and dizziness but were not exacerbated by noise or light.  (*Id.*)  Ms. Kain had fallen due to dizziness, most recently the day before the hearing.  (*Id.*)  She was not sure if her headaches were considered tension or cluster headaches but "they were always there" and increased throughout the day.  (*Id.*)

Ms. Kain did not believe she could perform her past work because of her symptoms of constant headaches, dizziness, light-headedness, and needing to lay down.  (Tr. 50.)  She guessed that she spent 10-15 hours a day laying down, including to sleep.  (*Id.*)  The longest period she could be upright before needing to lay down was 15-20 minutes.  (Tr. 51.)

2.    **Plaintiff's 2023 Hearing Testimony**

At a telephonic hearing on December 14, 2023, Ms. Kain testified in response to questions by the ALJ and her attorney.  (Tr. 2314-37.)  She was still living with her parents and had no income.  (Tr. 2321.)

Since the September 2021 hearing, Ms. Kain reported that her health conditions had worsened.  (Tr. 2322-23.)  Her headaches were worse, she was dealing with unexplained rashes, she was losing hair, and her tachycardia was still a problem.  (Tr. 2323.)  She had been experiencing the rashes, itching, and hair loss since 2018 or 2019.  (*Id.*)  She had headaches in

17

the morning that lasted all day.  (*Id.*)  She was trying to find the right medication because Topamax was not helping.  (*Id.*)  The headaches were very severe and cause her to cry, throw up, and need to lay down.  (Tr. 2323-24.)  The pain was ten on a scale of one to ten and located in the back-left of her head.  (Tr. 2324, 2327.)  Ms. Kain said she did not go to the emergency room for her headaches because she went in the past and "they just don't help."  (Tr. 2324.)

Ms. Kain's tachycardia caused her heart rate to jump from 80 bpm to 100 bpm or up to the 140s, even when she was sitting down.  (*Id.*)  Her ears would start ringing, and she became exhausted.  (Tr. 2330.)  To address her symptoms, she drank Gatorade "around the clock" and ate a high salt diet.  (*Id.*)  She wore compression stockings, but they did not help.  (*Id.*)

Ms. Kain did not engage in any hobbies or volunteer, but she did assist in household chores that she could perform while sitting, like folding clothes.  (Tr. 2325.)  On a typical day, she stayed in her room, sleeping, reading, or using the computer.  (Tr. 2326.)  While sitting in bed, she usually fell asleep after 20 minutes because of her medication.  (*Id.*)  She sometimes spent time with friends shopping at the mall or going to dinner—but she had not done this for a very long time.  (*Id.*)  If she went out, she came home right afterwards and felt exhausted.  (*Id.*)

Ms. Kain said Dr. Shields had diagnosed her with both POTS and inappropriate sinus tachycardia.  (Tr. 2327.)  These conditions caused episodes of dizziness and lightheadedness once if not a couple of times per day.  (*Id.*)  When these episodes occurred, Ms. Kain had to lie down in the dark the whole day with the lights off and the TV sound low.  (Tr. 2327-28.)  The dizziness and lightheadedness came with headaches, but also independently.  (Tr. 2328.)

When using her computer, Ms. Kain had to stop after about ten minutes because her hands would cramp.  (*Id.*)  They became very sore, so she would soak her hands in Epsom salt throughout the rest of the day and not return to using her computer.  (Tr. 2328-29.)  As for

18

reading and watching television, Ms. Kain did not have problems concentrating, paying attention, or remembering what she read/watched.  (Tr. 2329.)  But she usually fell asleep after about 20 minutes of these activities.  (*Id.*)  She took three or four naps a day, for two to three hours.  (*Id.*)  She still slept well at night.  (*Id.*)  Ms. Kain estimated she spent 15 to 20 hours lying down or sleeping in a 24-hour period.  (Tr. 2329-2330.)

Ms. Kain did not attend counseling.  (Tr. 2330.)  She took metoprolol for tachycardia, and it helped.  (Tr. 2330-2331.)  However, it made it difficult for her to function because it caused sleepiness, and she could feel it wearing off every six hours.  (Tr. 2331.)

### 3. Vocational Expert's 2023 Hearing Testimony

A Vocational Expert ("VE") testified at the 2023 hearing that a hypothetical individual of Plaintiff's age, education, and work experience, with the functional limitations described in the ALJ's RFC determination, could not perform Plaintiff's prior work, but could perform representative positions in the national economy, including order clerk, final assembler, and circuit board assembler.  (Tr. 2332-33.)  But if the person would either be off task 15% of the time or absent without excuse more than six times in a 12-month period, the VE testified that would preclude competitive employment.  (Tr. 2333.)

If the hypothetical individual was limited to occasional reaching in all directions, rather than just overhead, the VE testified that there would be no jobs available at the sedentary exertion level.  (Tr. 2334.)  If the individual could only sit for 15 minutes and stand for 10 minutes at a time, for a total of two hours, and would need at least two extra breaks per workday, the VE testified they would be unable to perform any work in the national economy.  (Tr. 2335.)

Plaintiff's attorney proposed new hypothetical limitations of standing and walking occasionally, no pushing or pulling, no balancing, stooping, kneeling, crouching, or crawling,

and no reaching overhead or below the waist.  (*Id.*)  The VE testified there would be no jobs for

an individual with these limitations.  (*Id.*)  If there were an added limitation to only occasionally

lifting 25 pounds, there would be no jobs available.  (*Id.*)  If the hypothetical individual had to lie

down for an hour each day, that would also preclude competitive employment.  (Tr. 2335-36.)

### III.    Standard for Disability

Under the Social Security Act, 42 U.S.C. § 423(a), eligibility for benefit payments

depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or
> mental impairment or impairments are of such severity that he is not only unable to
> do his previous work but cannot, considering his age, education, and work
> experience, engage in any other kind of substantial gainful work which exists in the
> national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a

five-step sequential analysis set out in agency regulations, summarized as follows:

1.    If the claimant is doing substantial gainful activity, he is not disabled.

2.    If the claimant is not doing substantial gainful activity, his impairment must
be severe before he can be found to be disabled.

3.    If the claimant is not doing substantial gainful activity, is suffering from a
severe impairment that has lasted or is expected to last for a continuous
period of at least twelve months, and his impairment meets or equals a listed
impairment, the claimant is presumed disabled without further inquiry.

4.    If the impairment does not meet or equal a listed impairment, the ALJ must
assess the claimant's residual functional capacity and use it to determine if
the claimant's impairment prevents him from doing past relevant work.  If
the claimant's impairment does not prevent him from doing his past relevant

20

work, he is not disabled.

5.      If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520, § 416.920[5]; *see also Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors

to perform other work available in the national economy.  *Id.*

## IV.      The ALJ's Decision

In his February 28, 2024 decision, the ALJ made the following findings:[6]

1.      The claimant meets the insured status requirements of the Social Security Act through March 31, 2024.  (Tr. 2296.)

2.      The claimant has not engaged in substantial gainful activity since March 10, 2020, the amended alleged onset date.  (*Id.*)

3.      The claimant has the following severe impairments: sinus tachycardia, migraines, polycystic ovarian syndrome, obesity, and hypotension.  (*Id.*)

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 2297.)

5.      The claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except: lifting/carrying 10 pounds occasionally and less than 10 pounds frequently; sitting for 6 hours, standing/walking for 2 hours, and pushing/pulling as much as can lift/carry; occasionally reaching overhead and frequently engaging in all other reaching; occasionally climbing ramps and stairs;

---

[5] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, in most instances, citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

[6] The ALJ's findings are summarized.

never climbing ladders, ropes, or scaffolds; occasionally balancing, stooping, kneeling, crouching, and crawling. She can never work at unprotected heights, around moving mechanical parts, or while operating a motor vehicle. She can tolerate frequent exposure to humidity and wetness, dust, odors, fumes, and pulmonary irritants, extreme cold and heat, and vibration. She can tolerate no more than loud noises. (Tr. 2298.)

6.  The claimant is unable to perform any past relevant work. (Tr. 2303.)

7.  The claimant was born in 1993 and was 24 years old, defined as a younger individual age 18-49, on the alleged disability onset date. (*Id.*)

8.  The claimant has at least a high school education. (*Id.*)

9.  Transferability of job skills is not material to the determination of disability. (*Id.*)

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform, including order clerk, final assembler, and circuit board assembler. (Tr. 2303-04.)

Based on the foregoing, the ALJ determined that Plaintiff had not been under a disability, as defined in the Social Security Act, from July 26, 2018, through the date of the decision on February 28, 2025. (Tr. 2304.)

## V.   Plaintiff's Arguments

Plaintiff raises four assignments of error: (1) the ALJ failed to comply with the Appeals Council remand and properly evaluate the medical opinion evidence (ECF Doc. 9, pp. 9-15); (2) the ALJ committed harmful error and applied the wrong standard of review when he adopted findings of the prior ALJ (*id.* at pp. 15-18); (3) the ALJ failed to properly evaluate whether Plaintiff's migraine headaches met a statutory Listing at Step Three of the sequential evaluation (*id.* at pp. 19-22); and (4) the ALJ committed harmful error when he stated that the amended onset date was March 10, 2023 (*id.* at p. 22).

## VI.    Law & Analysis

**A.    Standard of Review**

A reviewing court must affirm the Commissioner's conclusions absent a determination

that the Commissioner has failed to apply the correct legal standards or has made findings of fact

unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d

399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ

applied the correct legal standards and whether the findings of the ALJ are supported by

substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the

Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245

F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less

than a preponderance and is such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion."  *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028,

1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681

(6th Cir. 1989)).  The Commissioner's findings "as to any fact if supported by substantial

evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir.

2006) (citing 42 U.S.C. § 405(g)).  "'The substantial-evidence standard . . . presupposes that

there is a zone of choice within which the decisionmakers can go either way, without

interference by the courts.'"  *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535,

545 (6th Cir. 1986)).  Therefore, a court "may not try the case *de novo*, nor resolve conflicts in

evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir.

1984).  Even if substantial evidence supports a claimant's position, a reviewing court cannot

overturn the Commissioner's decision "so long as substantial evidence also supports the

conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-547 (6th Cir. 2004))).  A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

Because the Court concludes that the error challenged in Plaintiff's second assignment of error warrants remand, the Court addresses the assignments of error out of order.

**B.      Second Assignment of Error: The ALJ Committed Harmful Error When He Found That He Must Adopt the RFC From the 2020 ALJ Decision Under *Drummond***

In her second assignment of error, Ms. Kain argues that the ALJ "applied the wrong standard of review" when he found based on *Drummond v. Comm'r of Social Security*, 126 F.3d 837 (6th Cir. 1997), that res judicata would apply in this matter and therefore "incorrectly relied on the opinion of the prior ALJ" who issued the 2020 ALJ decision.  (ECF Doc. 9, pp. 15-16.) Instead, she argues that the ALJ should have followed the standard of review articulated by the Sixth Circuit in *Earley v. Commissioner of Social Security*, 893 F.3d 929 (6th Cir. 2018).  (*Id.*) The Commissioner responds that the ALJ properly gave a "fresh look" to the record when determining the RFC, as required by *Earley*.  (ECF Doc. 11, pp. 7-9.)

1.      **Standard of Review Applicable to Consideration of Prior ALJ Decisions**

In *Drummond v. Comm'r of Social Security*, the Sixth Circuit cited to "the principles of res judicata" in holding: "Absent evidence of an improvement in a claimant's condition, a subsequent ALJ is bound by the findings of a previous ALJ."  126 F.3d 837, 841-42 (6th Cir. 1997).  In a related Acquiescence Ruling, the SSA applied *Drummond* as follows:

> When adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the Act as the prior claim, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding or there has been a change in the law, regulations or rulings affecting the finding or the method of arriving at the finding.

AR 98-4(6), 63 Fed. Reg. 29771, 29773 (June 1, 1998).

More recently, in *Earley v. Commissioner of Social Security*, the Sixth Circuit reexamined *Drummond* and its reliance on principles of res judicata, and observed: "Unusual facts, it seems to us, led to some overstatement in *Drummond* but not to an incorrect outcome." 893 F.3d at 933.  While *Drummond* was decided based on res judicata principles, the *Earley* court clarified that "res judicata only 'foreclose[s] successive litigation of the very same claim,'" while "'a claim that one became disabled in 1990 is not the same as a claim that one became disabled in 1994.'"  *Id.* (citations omitted).  Thus, the *Earley* court made it clear that the doctrine of res judicata does not apply when a claimant has filed a new application seeking benefits for a new period of disability.

The Sixth Circuit went on to state that the inapplicability of res judicata to such cases "helps to explain why *Drummond* referred to 'principles of res judicata' – with an accent on the word 'principles.'"  *Id.* at 933 (citing 126 F.3d at 841-43).  The court described the applicable principles as "[f]inality, efficiency, and the consistent treatment of like cases," and explained that

an ALJ "honors those principles by considering what an earlier judge found with respect to a later application and by considering that earlier record." *Id.* (citations omitted).  Accordingly, the Sixth Circuit held: "it is fair for an administrative law judge to take the view that, absent new and additional evidence, the first administrative law judge's findings are a legitimate, albeit not binding, consideration in reviewing a second application." *Id.*  The court refused to hold that an ALJ "should completely ignore earlier findings and applications," explaining that "[f]resh review is not blind review" and "[a] later administrative law judge may consider what an earlier judge did if for no other reason than to strive for consistent decision making." *Id.* at 934.

More recently, the Sixth Circuit discussed the application of *Earley* in two unpublished decisions.  In *Dennis D. v. Comm'r of Soc. Sec.*, No. 23-3667, 2024 WL 1193662 (6th Cir. Mar. 20, 2024), the Sixth Circuit held that an ALJ's "misstatement of the legal standard" by saying that a prior ALJ's RFC was "binding" did not warrant remand where the record was "replete with evidence" that the ALJ "reached an independent conclusion while recognizing that he was not bound by the prior decision—as required under *Earley*." *Id.* at *4-5.  The *Dennis D.* court explained that the question before the court was whether the ALJ, "despite this misstatement of the legal standard, . . . treated his review of the new application as if he were bound by the prior decision, thereby depriving [the plaintiff] of a 'fresh look'" under *Earley*. *Id.* at *4.  Later, in *Gooden v. Comm'r of Soc. Sec.*, No. 23-3927, 2024 WL 2830817 (6th Cir. June 4, 2024), the Sixth Circuit reiterated that "the key question is whether the second ALJ treated the new application 'as if' they were 'bound by the prior decision.'" *Id.* at *4 (quoting *Dennis D.*, 2024 WL 1193662 at *4).  The court explained that courts "need determine only whether the second ALJ *actually* afforded the new application a 'fresh look' under *Earley*, notwithstanding rote recitation of a legal standard suggesting otherwise." *Id.* (emphasis in original).

## 2. The ALJ Did Not Clearly Afford the New Application a "Fresh Look"

Plaintiff argues that the ALJ applied the wrong standard of review based on *Drummond* and therefore "incorrectly relied on the opinion of the prior ALJ." (ECF Doc. 9, pp. 15-16.) The Commissioner admits that the ALJ "ultimately adopted Plaintiff's previous RFC," but argues that the ALJ nevertheless "satisfied the principles set forth in *Earley* by not adopting the prior findings in a mechanical fashion" and "engaged in an in-depth review and analysis of the new objective evidence related to Plaintiff's current claim period[.]" (ECF Doc. 11, p. 8.)

In the first section of his written decision, the ALJ stated:

> I note that the claimant in this case resides in Ohio, so I must apply Acquiescence Rulings (ARs) 98-4(6), Drummond v. Comm'r of Social Security, 126 F.3d 837 (6th Cir. 1997) . . . Drummond dictates that, "when adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the [Social Security Act] as the prior claim, adjudicators must adopt [a finding of a claimant's residual functional capacity or other finding required at a step in the sequential evaluation process] from the final decision by an ALJ . . . on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding . . . ." (AR 98-4(6)). . . . In this case, I adopted the residual functional capacity findings . . . from the prior decision that was dated March 9, 2020, because there was no new material evidence or allegations of worsening of symptoms.

(Tr. 2293-94 (emphasis added).)[7] Later, in assessing the medical opinion evidence, the ALJ noted that three of four state agency medical consultant opinions adopted the RFC from the 2020 ALJ decision and concluded that "the adopted ALJ findings" were more persuasive, explaining: "These findings comply with ruling from Drummond . . . , as I adopted the prior [RFC] limitations . . . from the ALJ decision dated March 9, 2020, in the absence of changed or worsening circumstances." (Tr. 2300.) Thus, the language used by the ALJ suggests that he felt he "must adopt" the RFC from the 2020 ALJ decision unless he found "new material evidence or

---

[7] References to the parallel standard in *Dennard v. Sec'y of Health and Human Services*, 907 F.2d 598 (6th Cir. 1990), have been omitted for purposes of clarity, since that standard is not at issue in the present appeal.

allegations of worsening of symptoms" or "changed or worsening circumstances."  (Tr. 2293-94, 2300.)  This goes beyond the standard described in *Earley*, where the court explained: "it is fair for an administrative law judge to take the view that, absent new and additional evidence, the first administrative law judge's findings are a legitimate, *albeit not binding*, consideration in reviewing a second application."  893 F.3d at 933 (emphasis added).

It must be acknowledged that the ALJ's written decision does reflect that he considered new evidence, including new treatment records and medical opinions.  At Step Two, the ALJ added "hypotension" as a severe impairment, discussed newer records relating to impairments he found to be non-severe, and addressed newer records in support of a finding that POTS was "a non-medically determinable impairment."  (Tr. 2296-97.)  At Step Three, he discussed newer medical records in finding that Ms. Kain did not meet or equal a Listing.  (Tr. 2297-98.)  At Step Four, he discussed newer medical records and newer medical opinions, including the opinions of two state agency medical consultants who reviewed the records in the context of the later-filed DIB application that the Appeals Council consolidated with the remanded case.  (Tr. 2298-2302.)  Thus, the ALJ clearly considered and discussed testimony, evidence, and opinions that post-date the 2020 ALJ decision in making the findings that are presently under review.

The question under *Earley* is whether the ALJ, despite considering the new evidence, nevertheless treated the new application for benefits "'as if' [he] were 'bound by the prior decision.'"  *Gooden*, 2024 WL 2830817, at *4 (quoting *Dennis D.*, 2024 WL 1193662 at *4).  The plain language of the ALJ's written decision suggests that he did.  He explicitly relied on the outdated *Drummond* standard when he explained that he "must apply" *Drummond*, which "dictates" that he "must adopt" the RFC from the 2020 ALJ decision "unless there is new and material evidence relating to such a finding."  (Tr. 2293-94.)  He then found "there was no new

material evidence or allegations of worsening symptoms" and adopted the RFC from the 2020 ALJ decision "in the absence of changed or worsening circumstances." (Tr. 2294, 2300.) Even though he provided a thorough review of the newer testimony, evidence, and medical opinions, the clear language of the 2024 ALJ decision nevertheless indicates that the ALJ felt he was bound to adopt the RFC from the 2020 ALJ decision absent "new material evidence" showing "changed or worsening circumstances." (*Id.*)

The Sixth Circuit's more recent decisions applying *Earley* do not conflict with this analysis. Although the ALJ in *Dennis D.* described a prior ALJ decision as "binding," the Sixth Circuit observed that "the very next sentence" in the ALJ's decision was a finding that the plaintiff had "'produced new and material evidence documenting a significant change in his condition.'" 2024 WL 1193662, *4. In that context, the court found the ALJ's description of the prior ALJ decision as "'binding' merely reflect[ed] a scrivener's error." *Id.* Further, the *Dennis D.* court went on to detail other evidence that the ALJ "did not consider himself bound by the earlier ruling," including his rejection of the prior ALJ's findings regarding the severity of the mental impairments and ultimate adoption of a different RFC. *Id.* at 5. The court found the record was "replete with evidence" that the ALJ "reached an independent conclusion while recognizing that he was not bound by the prior decision—as required under *Earley*." *Id.*

In *Gooden*, the Sixth Circuit similarly found that an ALJ "properly gave 'fresh review' to [plaintiff]'s new application by stating that she was not bound by the first ALJ's findings and independently assessing each allegation in [plaintiff]'s new application." 2024 WL 2830817, *3. As in *Dennis D.*, the ALJ in *Gooden* said that she was required to adopt the prior ALJ's RFC absent new and material evidence but went on to find that the plaintiff had presented such new and material evidence and declined on that basis to adopt the prior ALJ decision. *Id.*

29

Here, unlike *Dennis D.* and *Gooden*, the ALJ did not undermine his recitation of the outdated standard by concluding that he was not bound by the prior ALJ decision or declining to adopt the prior ALJ's RFC.  Quite the reverse, he explicitly adopted the RFC from the 2020 ALJ decision (*compare* Tr. 2298 *with* Tr. 69) after stating that he "must adopt" the prior ALJ decision "unless there is new and material evidence relating to such a finding" and concluding that "there was no new material evidence or allegations of worsening of symptoms" (Tr. 2293-94).

The question before this Court is whether the ALJ, "despite [his] misstatement of the legal standard, . . . treated [his] review of the new application as if [he] were bound by the prior decision, thereby depriving [Ms. Kain] of a 'fresh look'" under *Earley*.  *Dennis D.*, 2024 WL 1193662 at *4.  The plain language in the ALJ's written decision suggests that he did treat the 2020 ALJ decision as final and binding absent new and material evidence relating to Ms. Kain's medical condition.  This was a harmful error.[8]  He also failed to build an accurate and logical bridge between the evidence and the result when he used language that suggested he considered the 2020 ALJ decision to be more than "a legitimate, albeit not binding, consideration in reviewing a second application."  *Earley*, 893 F.3d at 933.

This harmful error is made more concerning when viewed in the context of Ms. Kain's fourth assignment of error, where she argues that the ALJ's repeated (incorrect) statement that the period of disability under consideration began on an amended alleged onset date of March 10, 2023 (Tr. 2293, 2294, 2296)—when the alleged onset date was actually amended to March 10, 2020 (Tr. 2320)—raises a concern that the ALJ "erroneously did not consider the period of time from March 10, 2020 through March 10, 2023."  (ECF Doc. 9, p. 22.)  The Commissioner

---

[8] The Commissioner has made no meaningful argument that the error was harmless, and any such argument is waived.  *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.") (internal citations omitted) (alterations in original).

responds that the ALJ's repeated recitation of an amended alleged onset date three years later than the actual amended alleged onset date was clearly "a mere scrivener's error" since "the ALJ discussed evidence throughout the decision from 2020 through 2023 that post-dated her previous disability denial." (ECF Doc. 11, p. 13.)

While it may be true that the ALJ inadvertently transposed a "3" for a "0" when stating the amended alleged onset date (Tr. 2293, 2294, 2296),[9] this Court cannot repeatedly make material assumptions in the Commissioner's favor that are at odds with the plain language of the ALJ's written decision. While the ALJ's discussion of testimony, medical records, and medical opinions from 2020 through 2023 could reflect that he based his decision on the correct disability period and applied the correct standard of review under *Earley*, the plain language of the decision states otherwise. Given the legal significance of the erroneous statements in the ALJ's decision, suggesting that the ALJ may have applied an incorrect standard of review and/or considered an improperly shortened disability term, the Court finds that the decision lacks the support of substantial evidence and fails to build "an accurate and logical bridge between the evidence and the result." *See Fleischer*, 774 F. Supp. 2d at 877.

For the reasons set forth above, the undersigned concludes that remand is appropriate, so that the ALJ may "have another opportunity to review the application under the correct standard." *Earley*, 893 F.3d at 934. Given this Court's determination that remand is warranted, it is unnecessary to address the remaining assignments of error.

---

[9] It appears that the ALJ also included references to the initial alleged onset date in 2018. (*See* Tr. 2303, 2304.)

## VII.    Conclusion

For the foregoing reasons, the final decision of the Commissioner is **VACATED**, and the case is **REMANDED**, pursuant to 42 U.S.C. § 405(g) sentence four.  On remand, the ALJ should apply the standard of review articulated by the Sixth Circuit in *Earley v. Comm'r of Soc. Sec.*, 893 F.3d 929 (6th Cir. 2018) to any consideration of a prior ALJ's residual functional capacity findings and should ensure that he considers the entire alleged disability period.

September 25, 2025

/s/*Amanda M. Knapp*
AMANDA M. KNAPP
United States Magistrate Judge